# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JESSE A. LANG, Derivatively on Behalf of Nominal Defendant WHEELS UP EXPERIENCE INC., | ) ) ) | |
| | ) | Case No. 1:23-cv-8316 |
| Plaintiff, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| KENNETH DICHTER, TODD SMITH, GEORGE MATTSON, ADAM ZIRKIN, DAVID ADELMAN, TIMOTHY ARMSTRONG, ALAIN BELLEMARE, ADAM CANTOR, ANDREW DAVIS, DWIGHT JAMES, DAN JANKI, ZACHARY LAZAR, LEE MOAK, JEFF NEDELMAN, CHI CHEUNG, MARC FARRELL, ADMIRAL MIKE MULLEN, BRAD RADECKI, SUSAN SCHUMAN, ERIK SNELL, RAVI THAKRAN, and ERIC PHILLIPS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| WHEELS UP EXPERIENCE INC., | ) ) ) | |
| Nominal Defendant. | | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jesse A. Lang ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Wheels Up Experience Inc. ("Wheels Up" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers for Defendants' (defined below) breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal

knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Wheels Up, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Wheels Up against certain officers and members of the Company's Board (collectively, the "Individual Defendants") (defined further, *infra*) for, among other things, violating the federal securities laws and breaching their fiduciary duties to Company stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions from November 9, 2022 through the present (the "Relevant Period") regarding the Company's financial results.

2.    Wheels Up is an aviation company incorporated in Delaware and based in New York. The Company offers membership programs, aircraft management, whole aircraft sales, and commercial travel services. Wheels Up further provides freight, safety, and security solutions.

3.    Throughout the Relevant Period, the Individual Defendants issued materially false and misleading statements and/or failed to disclose that: (i) the Company had failed to implement adequate internal controls to prevent false and misleading statements in its SEC filings and other public disclosures; (ii) as a result, the Company's financial statements from September 30, 2022 through the present included "certain errors" forcing Wheels Up to restate its previously filed financial statements; and (iii) as a result, Defendants' statements about its business, operations,

and prospects lacked a reasonable basis.

4.      As a result of the foregoing, a securities fraud class action has commenced against the Company, its former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), captioned, *The Lee Goodman Trust v. Wheels Up Experience et al,*1:23-cv-02900 (E.D.N.Y.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

5.      In light of the Individual Defendant's misconduct – which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged here – the Company will expend millions of dollars.

6.      Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into, and the subsequent damages were sustained in, this judicial.

## PARTIES

*Plaintiff*

27      Plaintiff currently holds shares of Wheels Up common stock and has been a continuous holder since June 2021.

*Nominal Defendant*

28      Nominal Defendant Wheels Up is incorporated under the laws of Delaware with its principal executive offices located at 601 West 26th Street, Suite 900, New York, New York. Wheels Up's common stock trades on the NYSE under the ticker symbol "UP."

*Individual Defendants*

29      Defendant Kenneth Dichter ("Dichter") is Wheels Up's founder, and he served as

4

Chief Executive Officer ("CEO") of the Company from 2013 until May 9, 2023 and as a member of the Board from 2013 until September 20, 2023. According to the Company's public filings, Defendant Dichter received $8,650,754 in 2022 in compensation from the Company. According to the proxy statement that the Company filed with the SEC on April 19, 2023 (the "2023 Proxy Statement"), as of April 13, 2023, Defendant Dichter beneficially owned 20,068,285 shares, or 8%, of the total outstanding common stock of the Company. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Dichter owned approximately $106,562,593 worth of Wheels Up stock as of that date.

30    Defendant Todd Smith ("Smith") has served as Wheels Up's CFO since June 2022. Defendant Smith also served as the Company's Interim CEO between May 9, 2023 and September 20, 2023. According to the Company's public filings, Defendant Smith received $4,770,216 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Smith beneficially owned 410,256 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Smith owned approximately $2,178,459 worth of Wheels Up stock as of that date. During the Relevant Period, while the Company's stock price was artificially inflated, Defendant Smith sold 273,504 shares of Company stock while in possession of material non-public information for proceeds of $284,444.

31    Defendant George Mattson ("Mattson") has served as CEO and as a member of the Board since September 20, 2023.

32    Defendant Adam Zirkin ("Zirkin") has served as Chairman of the Wheels Up Board since September 20, 2023.

33    Defendant David Adelman ("Adelman") has served as a member of the Board since

5

2013 and serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Adelman received $327,731 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Adelman beneficially owned 2,226,740 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Adelman owned approximately $11,823,989 worth of Wheels Up stock as of that date.

34     Defendant Timothy Armstrong ("Armstrong") has served as a member of the Board since 2019 and serves as a member of the Audit Committee and the Nominating and ESG Committee. According to the Company's public filings, Defendant Armstrong received $265,178 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Armstrong beneficially owned 1,200,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Armstrong owned approximately $6,375,967 worth of Wheels Up stock as of that date.

35     Defendant Alain Bellemare ("Bellemare") has served as a member of the Board since September 20, 2023.

36     Defendant Adam Cantor ("Cantor") has served as a member of the Board since September 20, 2023.

37     Defendant Andrew Davis ("Davis") has served as a member of the Board since September 20, 2023.

38     Defendant Dwight James ("James") has served as a member of the Board since February 2022.

39     Defendant Dan Janki ("Janki") has served as a member of the Board since August

6

15, 2023.

40    Defendant Zachary Lazar ("Lazar") has served as a member of the Board since September 20, 2023.

41    Defendant Lee Moak ("Moak") has served as a member of the Board since September 26, 2023.

42    Defendant Jeff Nedelman ("Nedelman") has served as a member of the Board since September 20, 2023.

43    Defendant Chi Cheung ("Cheung") served as a member of the Board from 2016 until September 20, 2023. According to the Company's public filings, Defendant Cheung received $289,204 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Cheung beneficially owned 230,076 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Cheung owned approximately $1,221,704 worth of Wheels Up stock as of that date.

44    Defendant Marc Farrell ("Farrell") served as a member of the Board from 2021 until September 30, 2023. According to the Company's public filings, Defendant Farrell received $225,001 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Farrell beneficially owned 80,450 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Farrell owned approximately $427,190 worth of Wheels Up stock as of that date.

45    Defendant Admiral Mike Mullen ("Mullen") served as a member of the Board from 2021 until September 30, 2023. According to the Company's public filings, Defendant Mullen

received $295,575 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Mullen beneficially owned 226,511 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Mullen owned approximately $1,202,773 worth of Wheels Up stock as of that date.

46      Defendant Brad Radecki ("Radecki") served as a member of the Board from 2017 until September 20, 2023. According to the Company's public filings, Defendant Radecki received $391,397 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Radecki beneficially owned 360,128 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Radecki owned approximately $1,912,280 worth of Wheels Up stock as of that date.

47      Defendant Susan Schuman ("Schuman") served as a member of the Board from 2021 until September 20, 2023. According to the Company's public filings, Defendant Schuman received $245,865 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Schuman beneficially owned 106,347 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Schuman owned approximately $564,703 worth of Wheels Up stock as of that date.

48      Defendant Erik Snell ("Snell") served as a member of the Board from November 2020 until September 26, 2023

49      Defendant Ravi Thakran ("Thakran") served as a member of the Board from 2021 until September 20, 2023 and as Chairman of the Board between May 9, 2023 and September 20,

2023. According to the Company's public filings, Defendant Thakran received $243,396 in 2022 in compensation from the Company. According to the 2023 Proxy Statement, as of April 13, 2023, Defendant Thakran beneficially owned 3,162,789 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2023 was $5.31, Defendant Thakran owned approximately $16,794,410 worth of Wheels Up stock as of that date.

50      Defendant Eric Phillips ("Phillips") served as a member of the Board from July 2021 until February 2022.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51      By reason of their positions as officers and/or directors of Wheels Up, and because of their ability to control the business and corporate affairs of Wheels Up, the Individual Defendants owed Wheels Up and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wheels Up in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wheels Up and its shareholders so as to benefit all shareholders equally.

52      Each director and officer of the Company owes to Wheels Up and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

53      The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wheels Up, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54      To discharge their duties, the officers and directors of Wheels Up were required to

exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Wheels Up, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

56    As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

57    To discharge their duties, the officers and directors of Wheels Up were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Wheels Up were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Wheels Up's own Staff Code of Conduct, Code of Ethics for CEO and Senior Financial Officers, and Board of Directors Code of Conduct (collectively, the "Codes of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Wheels Up conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Wheels Up and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wheels Up's operations would comply with all applicable laws and Wheels Up's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the

Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

58    Each of the Individual Defendants further owed to Wheels Up and the shareholders the duty of loyalty requiring that each favor Wheels Up's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

59    At all times relevant hereto, the Individual Defendants were the agents of each other and of Wheels Up and were at all times acting within the course and scope of such agency.

60    Because of their advisory, executive, managerial, and directorial positions with Wheels Up, each of the Individual Defendants had access to adverse, non-public information about the Company.

61    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wheels Up.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and/or assisted each other in breaching their respective duties.

63     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

64     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

65     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of Wheels Up, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wheels Up and at all times acted within the course and scope of such agency.

## WHEELS UP'S CODES OF BUSINESS CONDUCT AND ETHICS

68     Wheels Up's Code of Business Conduct and Ethics (the "Code of Conduct") begins

with a commitment to "conduct [] business according to the highest ethical standards and integrity."

69      The Code of Conduct applies to all "officers, directors, employees and contractors," and violations of the Code of Conduct can lead to disciplinary action, including "termination in accordance with applicable laws and collective bargaining agreements (if any) and possibly legal action. Subject to applicable law, disciplinary measures can also apply to any manager or supervisor who directs, approves or condones violations, or has knowledge of violations and does not promptly report and correct them."

70      In a section titled "**INSIDER TRADING**," the Code of Conduct states:

During the course of your relationship with Wheels Up, you may receive or become privy to material, nonpublic information about Wheels Up, or its Business Partners. Material information includes information that could be important for an investor to consider in making a decision about whether to buy or sell securities. Federal, state or local securities law prohibits you from using such material, nonpublic information to purchase, sell, gift or otherwise trade in the Company's securities or provide any such information to others outside of Wheels Up. The penalties for trading on material, nonpublic information can be severe, both for individuals involved in such unlawful conduct and their employers and supervisors, and may include jail terms, criminal fines, civil penalties and civil enforcement injunctions.

71      In a section titled "**COMPLIANCE WITH LAWS**," the Code of Conduct states:

"It is your duty to comply fully with all applicable laws, rules and regulations in cities, states, and countries in which Wheels up operates."

72      With respect to the integrity of the Company's financial records, the Code of Conduct states:

All Wheels Up records must be complete, accurate and reliable in all material respects. Wheels Up policy is to comply with utmost best practice in maintaining complete and accurate financial books, financial and tax records and statements related to its business in accordance with applicable laws, regulations and recognized industry practices. Wheels Up ensures transparency in all its financial and tax dealings and has adequate internal controls in place.

14

73 In a section titled "**ADDITIONAL EXPECTATIONS OF WHEELS UP LEADERS**," the Code of Conduct states:

> In addition to the expectations that apply to all Personnel Wheels Up leaders have additional responsibilities under this Code. Wheels Up leaders must:
>
> - Demonstrate the highest standards of integrity—set the right example, and others will follow your lead.
>
> - Create a culture of compliance and ensure that business results are never treated as being more important than acting legally and ethically.
>
> - Discuss ethics and compliance topics with Personnel and ensure that everyone on your team completes compliance training and other compliance requirements.
>
> - Create an environment where Personnel are comfortable speaking up and be available to receive reports of potential violations of the Code or applicable laws.
>
> - Ensure that reports of suspected violations are brought to the attention of the Legal or Human Resources Team immediately.
>
> - Protect Personnel who make reports from retaliation and safeguard the confidentiality of investigations as needed.

## WHEELS UP'S AUDIT COMMITTEE CHARTER

74 Wheels Up's Audit Committee Charter states that the purpose of the Audit Committee is to:

> [A]ssist in the Board's oversight of:
>
> - the adequacy and integrity of the Company's accounting and financial reporting processes and procedures;
> - the integrity of the Company's financial statements;
> - the Company's compliance with legal and regulatory requirements and the Company's enterprise risk management program;
> - the independent auditor's appointment, qualifications, independence, work and retention;
> - the scope, approach, performance and results of the independent auditors and the

Company's internal audit function; and,

- to prepare the Committee's report required by the SEC to be included in the Company's annual proxy statement.

75      In a subsection titled "*Meetings with Management, the Internal Auditor, and the Independent Auditor*," the Audit Committee Charter states that the Audit Committee shall "review and discuss the annual audited financial statements with management and the independent auditor" and "review and discuss the Company's financial reporting processes (both internal and external) with the independent auditor and the internal auditor."

76      With respect to the Company's quarterly financial statements, the Audit Committee Charter states that the Audit Committee "shall review and discuss the quarterly financial statements with management, the internal auditor (if any) and the independent auditor."

77      The Audit Committee Charter states that the Audit Committee shall:

[D]iscuss any disclosures made to the Committee by the Company's Chief Executive Officer or Chief Financial Officer during their certification process for the Form 10-K and the Form 10-Q regarding: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any material weakness in internal controls identified to the independent auditor; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

78      The Audit Committee Charter further states that the Audit Committee shall:

[R]eport regularly to the Board, and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

## **SUBSTANTIVE ALLEGATIONS**

### *False and Misleading Statements*

79      On November 9, 2022, after the market closed, the Company issued a press release

announcing its unaudited third quarter financial results. The press release was included in the Company's 8-K report filed with the SEC the same day. The financial results revealed a net loss of $86,838,000 for the three months ending September 30, 2022 and a net loss of $268,637,000 for the nine months ending September 30, 2022. The Company further reported goodwill of $521,847,000 and an accumulated deficit of $988,964,000 for the period ending September 30, 2022.

80      That same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "3Q22 10-Q"). Attached to the 3Q22 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dichter and Smith attesting to the accuracy of the report. The 3Q22 10-Q reported the same net loss, goodwill, and accumulated deficit figures that were contained in the press release and Form 8-K issued the same day.

81      Failing to identify any material deficiencies in the Company's internal controls, the 3Q22 10-Q stated:

**ITEM 4. CONTROLS AND PROCEDURES**

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective at a reasonable assurance level.

Changes in Internal Control over Financial Reporting

[T]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2022, which were identified in connection with management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15

under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

82      On March 9, 2023, before the market opened, Wheels Up issued a press release announcing its unaudited fourth quarter financial results. The Company reported a net loss of $238,910,000 for the three months ending December 31, 2022 and a net loss of $507,547,000 for the year ending December 31, 2022. The Company further reported goodwill of $396,118,000 and impairment of goodwill of $132,000,000 for the period ending December 31, 2022.

83      The statements identified in ¶¶ 64-67 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) certain of the Company's financial statements contained "certain errors" and would need to be restated; (ii) the Company failed to address material deficiencies in its internal controls; (iii) as a result of the foregoing, the Company's annual filings would be delayed in violation of NYSE listing requirements; and (iv) the Individual Defendants' statements regarding the Company's business and prospects lacked a reasonable basis.

***The Truth Emerges***

84      On March 17, 2023, after the market closed, the Company issued a Notification of Late Filing on Form 12b-25, revealing that the Company would be unable to timely file its Annual Report on Form 10-K for the year 2022 (the "2022 10-K"). The Notification stated, in relevant part:

> The Company experienced unanticipated delays in compiling certain necessary information to complete its audited financial statements and prepare a complete filing of its Annual Report in a timely manner without unreasonable effort or expense.
>
> The Company anticipates that the Annual Report will be filed as soon as practicable and prior to the fifteenth calendar day following the prescribed due date.

85      On this news, the price of the Company's stock declined 3.28%, closing at $.797

per share on March 20, 2023, the following trading day.

86      On March 31, after the market closed, Wheels Up filed a Form 8-K with the SEC

announcing that the Company would restate its financial statements from September 30, 2022 to

the present due to a "material weakness" in its internal controls over financial reporting. That filing

stated:

> Item 2.02 Results of Operations and Financial Condition.
>
> The Company is filing this Amendment No. 1 to the Original Filings to reflect adjustments to the presentation of the Company's unaudited financial statements and reconciliations of Net loss to Adjusted EBITDA, in each case contained in the Original 3Q Press Release and the Original 4Q Press Release and incorporated by reference into the Original 3Q Filing and the Original 4Q Filing, respectively. In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, the Company determined that non-cash goodwill impairment charges of (i) $62.0 million should have been recognized by the Company during the three months ended September 30, 2022, based on the Company's reassessment of the fair value of the legacy Wheels Up reporting unit (excluding Air Partner) ("WUP Legacy") as of September 30, 2022, and (ii) $118.0 million should have been recognized by the Company during the three months ended December 31, 2022 [and $180 million for the twelve months ended December 31, 2022], based on the assessment of the fair value of WUP Legacy as of December 31, 2022, in each case that were necessary to reflect the diminished fair value of WUP Legacy as of the applicable measurement dates.
>
> The recognition of non-cash goodwill impairment charges of $62.0 million for the three months ended September 30, 2022 and $118.0 million for the three months ended December 31, 2022 resulted in the following changes to the Company's unaudited condensed consolidated financial statements set forth in the Original Press Releases:
>
> - For the three and nine months ended September 30, 2022, the Company recognized a charge for "Impairment of goodwill" of $62.0 million in the Company's unaudited condensed consolidated statements of operations, which resulted in:
>   - a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;
>   - a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per

19

share, for the nine months ended September 30, 2022; and

- o corresponding adjustments, and associated impacts of the adjustments, to:

  - ☞ the balances of the "Goodwill" [of $459,847,000] and "Accumulated deficit" [of $1,050,964,000] line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;

  - ☞ the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and

  - ☞ the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the Company's reconciliations of Net loss to Adjusted EBITDA for the three and nine months ended September 30, 2022.

- For the three months ended December 31, 2022, the Company decreased the charge for "Impairment of goodwill" by $14.0 million in the Company's unaudited condensed consolidated statements of operations versus what was reported in the Original 4Q Press Release, which resulted in:

  - o a $14.0 million decrease to the Company's Net loss for the three months ended December 31, 2022 and, taking into account the impact of the non- cash goodwill impairment charge for the three months ended September 30, 2022, a $48 million increase to the Company's Net loss for the year ended December 31, 2022, in each case versus the previously reported financial results;

  - o a revised Net loss of $224.9 million, or $0.91 per share, for the three months ended December 31, 2022, and $555.5 million, or $2.26 per share, for the year ended December 31, 2022; and

  - o corresponding adjustments, and associated impacts of the adjustments, the following items, in each case in the same manner described with respect to the "Impairment of goodwill" charge recognized during the three and nine months ended September 30, 2022 above:

    - ☞ the Company's unaudited condensed consolidated balance sheets as of December 31, 2022;

    - ☞ the unaudited condensed consolidated statements of cash

flows for the year ended December 31, 2022; and

&#x221E; the reconciliations of Net loss to Adjusted EBITDA for the three months and year ended December 31, 2022.

- The adjustments did not impact the Company's Adjusted EBITDA results for the three and nine months ended September 30, 2022 or the three months and year ended December 31, 2022.

Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

**(a)** On March 27, 2023, the Company, on the recommendation of the Audit Committee of the Company's Board of Directors, concluded that the Prior Financial Statements should no longer be relied upon. This determination resulted from the identification of an error in the Prior Financial Statements, which resulted in a non-cash goodwill impairment charge related to WUP Legacy for the three months ended September 30, 2022 that is described in Item 2.02 of this Amendment No. 1.

**(b)** The Company has assessed the materiality of this error in accordance with applicable SEC rules, and has concluded that the Prior Financial Statements should be restated. The Company intends to include the restated Prior Financial Statements in an amended Quarterly Report on Form 10-Q/A (the "Amended Quarterly Report") to be imminently filed with the SEC. As a result of the restatement of the Prior Financial Statements and the Amended Quarterly Report, management has determined that a material weakness existed in the Company's internal control over financial reporting related to the financial statement close process for the three months ended September 30, 2022.

87     That same day, Wheels Up filed with the SEC the Restatement on Form 10-Q/A for the 3Q22 10-Q. Attached to the Restatement were SOX certifications signed by Defendants Dichter and Smith attesting to the accuracy of the Restatement. The Restatement revealed the same information that was contained in the Form 8-K issued the same day regarding the Company's net loss, goodwill, impairment of goodwill, and accumulated deficit and stated that the Company's internal controls were inadequate:

ITEM 4. CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Form 10-Q/A.

At the time of the Original 10-Q Filing, management, including our Chief Executive Officer and Chief Financial Officer, initially concluded that our disclosure controls and procedures were effective as of September 30, 2022. As a result of the restatement of the Company's financial statements and the material weakness identified below, management has reconsidered its assessment and now concludes that we did not maintain effective disclosure controls and procedures.

Management's Report on Internal Control over Financial Reporting

In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, management identified a material weakness in certain internal controls over financial reporting related to the financial statement close process. The deficiency resulted in a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022 to recognize a non-cash goodwill impairment charge which should have been recognized during the three months ended September 30, 2022, which resulted in the understatement of Net loss for the three and nine months ended September 30, 2022. The Company filed a Quarterly Report on Form 10-Q/A with the SEC on March 31, 2023 to restate the unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022. The Company's remediation plan will be described in the Company's Annual Report on Form 10-K for the year ended December 31, 2022.

88     Also that same day, the Company filed its 2022 10-K, which included SOX certifications signed by Defendants Dichter and Smith attesting to the accuracy of the filing. With respect to the deficiencies in the Company's internal controls, the 2022 10-K stated:

ITEM 9A. CONTROLS AND PROCEDURES

Evaluation of Disclosure Controls and Procedures

As required by Rule 13a-15(b) under the Exchange Act, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the period covered by this Annual Report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures

were not effective as of December 31, 2022 due to material weaknesses in our internal control over financial reporting described below. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the consolidated financial statements for the periods covered by and included in this Annual Report fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with generally accepted accounting principles in the United States of America ("GAAP").

Management's Annual Report on Internal Control over Financial Reporting

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022 based on the criteria described in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management, including the Company's Chief Executive Officer and Chief Financial Officer, concluded that our internal control over financial reporting was not effective as of December 31, 2022 due to control deficiencies that, when aggregated, resulted in the material weaknesses described below, which are defined as a deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

We did not maintain effective controls over information technology ("IT") for IT systems and applications that are relevant to the preparation of the consolidated financial statements. Specifically, we identified deficiencies in (i) user access controls to ensure appropriate segregation of duties, (ii) controls that restrict user access to financial applications, programs and data affecting underlying accounting records, and (iii) program change management controls affecting IT applications and underlying accounting records, that ensure IT program and data changes are identified, tested, authorized and implemented properly. None of the IT deficiencies resulted in a material misstatement to our annual or interim consolidated financial statements for the year ended December 31, 2022.

We did not maintain effective controls over the financial statement close and key business processes. Specifically, we did not consistently execute on our established accounting policies and procedures, and did not design, document and maintain controls to achieve complete, accurate and timely financial accounting, reporting and disclosures in accordance with GAAP. These include controls over account reconciliations, segregation of duties, review of journal entries and review of complex accounting matters. This deficiency resulted in a restatement of our unaudited condensed consolidated financial statements for the quarter and year-to-date period ended September 30, 2022.

89      On this news, the price of the Company's stock declined 11.73%, closing at $.5610 per share on April 3, 2023, the following trading day.

**Insider Sales**

90      During the Relevant Period, Defendant Smith capitalized off of the artificially inflated price of the Company's stock by selling his personal holdings of Company stock while in possession of material non-public information.

91      Specifically, on January 3, 2023, while the price of Wheels Up's stock was inflated due to the Individual Defendants' materially false and misleading statements, Defendant Smith sold 273,704 shares of Company stock at a price of $1.04 per share for proceeds of $284,444. The share price of $1.04 at the time of the sale was 85.38% higher than the price of Wheels Up's stock on April 3, 2023 after the corrective disclosure.

**Harm to the Company**

92      As a direct and proximate result of the Individual Defendants' misconduct, Wheels Up has lost and expended, and will lose and expend, millions of dollars.

93      Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company and its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

94      Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

95      Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company,

including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96      As a direct and proximate result of the Individual Defendants' conduct, Wheels Up has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97      Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

98      Wheels Up is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99      Plaintiff is an owner of Wheels Up common stock and has been a continuous shareholder of Company stock at all relevant times.

100      Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

101      A pre-suit demand on the Board of Wheels Up is futile and, therefore, excused. At the time this action was commenced, the Board consisted of Defendants Mattson, Zirkin, Adelman, Armstrong, Bellemare, Cantor, Davis, James, Janki, Lazar, Moak, and Nedelman (the "Director Defendants"). Plaintiff is only required to show that six of the twelve Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to

vigorously prosecute this action. As set forth below, all twelve Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

102    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

103    The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

104    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

105    Defendants Armstrong, Davis, and Moak serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and

omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

106    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Directors violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

107    The Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Specifically, none of the Director Defendants have taken remedial action to redress the conduct alleged herein. For instance, none of the Director Defendants have sought to enforce Wheels Up's Clawback Policy, which provides:

> [I]f the Committee determines that a vice president or more senior officer, including any named executive officer, Participant has engaged in fraud or misconduct that caused, in whole or in part, the need for a required restatement of the Company's financial statements filed with the Commission, the Committee will review all incentive compensation awarded to or earned by the Participant, including, without limitation, any Award under the Plan, with respect to fiscal periods materially affected by the restatement and may recover from the Participant all such incentive compensation to the extent that the Committee deems appropriate after taking into account the relevant facts and circumstances. Any recoupment hereunder may be

in addition to any other remedies that may be available to the Company under applicable law, including, disciplinary action up to and including termination of employment. For the avoidance of doubt, any award granted under the Plan shall be subject to the Clawback Policy to the full extent such Clawback Policy applies.

108    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

109    The acts complained of herein constitute violations of fiduciary duties owed by Wheels Up's officers and directors, and these acts are incapable of ratification.

110    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Wheels Up. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Wheels Up, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

111    If there is no directors' and officers' liability insurance, then the directors will not cause Wheels Up to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

112    Thus, for all of the reasons set forth above, all of the directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

<u>**COUNT I**</u>
**Against The Individual Defendants For Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

113    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts,

practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

117    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Wheels Up were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

118    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Wheels Up, their control over, and/or receipt and/or modification of Wheels Up's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Wheels Up, participated in the fraudulent scheme alleged herein.

119    As a result of the foregoing, the market price of Wheels Up common stock was artificially inflated. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Wheels Up common stock in purchasing Wheels Up common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

120    Likewise, as a result of the wrongful conduct alleged herein, the Company has also suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II
**Against The Individual Defendants**
**For Breach Of Fiduciary Duty**

121    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

123    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

124    The Individual Defendants breached their fiduciary duties of good faith, candor, loyalty, and due care by making and/or authorizing false and misleading statements concerning the Company's business, finances, and the adequacy of its internal controls.

125    During the Relevant Period, the Individual Defendants intentionally or recklessly made or permitted materially false and misleading statements and omitted material facts concerning the Company's financial results, business, and prospects.

126    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

31

deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

128     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

129     Plaintiff, on behalf of Wheels Up, has no adequate remedy at law.

### COUNT III
**Against Defendant Smith**
**For Breach of Fiduciary Duties (*Brophy Claim*)**

130     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131     During the Relevant Period, Defendant Smith held a position with the Company that provided him access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding his duty to refrain from trading in Wheels Up's common stock under the circumstances, Defendant Smith sold his holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

132     The insider sale detailed herein was not part of any regular pattern of sales for

Defendant Smith and was suspicious in terms of timing and amount.

133     The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendant Smith misappropriated to his own benefit when he sold Wheels Up stock. At the time of his stock sale, Defendant Smith was aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  Defendant Smith's sale of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

134     Plaintiff, on behalf of Wheels Up, has no adequate remedy at law.

**COUNT IV**
**Against The Individual Defendants For Aiding and**
**Abetting Breach of Fiduciary Duty**

135     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

137     Plaintiff on behalf of Wheels Up has no adequate remedy at law.

**COUNT V**
**Against The Individual Defendants**
**For Unjust Enrichment**

138    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wheels Up.

140    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Wheels Up that was tied to the performance or artificially inflated valuation of Wheels Up or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

141    Defendant Smith was further unjustly enriched with respect to insider sales of Company stock.

142    Plaintiff, as a stockholder and a representative of Wheels Up, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

143    Plaintiff on behalf of Wheels Up has no adequate remedy at law.

**COUNT V**
**Against The Individual Defendants**
**For Waste Of Corporate Assets**

144    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145    The Individual Defendants breached their fiduciary duties by failing to properly

supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

146    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

147    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

148    Plaintiff on behalf Wheels Up has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Wheels Up and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Wheels Up to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Wheels Up and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure

controls;

- ▪ developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- ▪ strengthening the Company's internal operational control functions;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 8, 2023                **RIGRODSKY LAW, P.A.**

By:    */s/ Timothy J. MacFall*
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com
Email: vl@rl-legal.com
Email: sa@rl-legal.com

*Attorneys for Plaintiff Jesse A. Lang*